No. 26-10911-J

# In the United States Court of Appeals for the Eleventh Circuit

MAURICE SHNAIDER, *et al.*,
*Plaintiffs–Appellants*,
v.
AMERICAN MUSLIMS FOR PALESTINE, *et al.*,
*Defendants–Appellees*.

## BRIEF OF THE STATE OF FLORIDA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:24-cv-01067-MSS-SPF

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

JEFFREY PAUL DESOUSA
*Chief Deputy Solicitor General*
TYLER E. GUSTAFSON
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*tyler.gustafson@myfloridalegal.com*

August 10, 2026

## CERTIFICATE OF INTERESTED PERSONS

The State of Florida certifies that, to the best of its knowledge, the following is a complete list of interested persons, as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Abudayyeh, Hatem – Defendant-Appellee

2. Abuirshaid, Osama – Defendant-Appellee

3. Ahmad, Munjed – Defendant-Appellee

4. Akl, Abdullah – Defendant-Appellee

5. American Muslims for Palestine – Defendant-Appellee

6. Americans for Justice in Palestine Educational Foundation – Defendant-Appellee

7. Baroud, Zarefah – Defendant-Appellee

8. Bazian, Hatem – Defendant-Appellee

9. Boyd, Christina A. – Counsel for Appellees American Muslims for Palestine, Americans for Justice in Palestine Educational Foundation, Hatem Bazian, Munjed Ahmad, Osama Abuirshaid, Saleh Sarsour, and Shakeel Sayed (collectively, "AMP Appellees")

10. Brenner, Michael – Counsel for Appellants

11. Brull, Shira Ronit Zenilman – Plaintiff-Appellant

12. CodePink – Defendant-Appellee

13. Daniel, Laurie Webb – Counsel for Appellants

14. DeSousa, Jeffrey Paul – Counsel for Amicus, State of Florida

15. Dewhirst, David M.S. – Counsel for Amicus, State of Florida

16. Elhosary, Samira S. – Counsel for AMP Appellees

17. Elson, Ben H. – Counsel for Appellees Hatem Abudayyeh, Magdi Odeh, and United States Palestinian Community Network (collectively, "USPCN Appellees")

18. Flynn, Hon. Sean P. – U.S. Magistrate Judge

19. Greenberg, Aileen (a/k/a Hana Greenberg) – Plaintiff-Appellant

20. Greenberg, Harold M. (a/k/a Aharon Mordechai Greenberg) – Plaintiff-Appellant

21. Gustafson, Tyler E. – Counsel for Amicus, State of Florida

22. Halley, Adam Fischer – Plaintiff-Appellant

23. Halley, Boaz Kessler – Plaintiff-Appellant

24. Halley, Ethan Kessler (a/k/a Eitan Kessler Halley) – Plaintiff-Appellant

25. Halley, Sadie Kessler – Plaintiff-Appellant

26. Halley, Wendy Kessler – Plaintiff-Appellant

27. Halpern, Alan Howard – Plaintiff-Appellant

28. Herzallah, Taher – Defendant-Appellee

29. Jaber, Rafeeq – Defendant-Appellee

30. Jump, Christina A. – Counsel for AMP Appellees

31. Kessler, Jane – Plaintiff-Appellant

32. Kessler, Robert – Plaintiff-Appellant

33. Kiswani, Nerdeen – Defendant-Appellee

34. Lipnick, Harvey Solomon (a/k/a Chaim Shabtai Livneh) – Plaintiff-Appellant

35. Lubin, Alec Meyer – Plaintiff-Appellant

36. Lubin, Hal David – Plaintiff-Appellant

37. Lubin, Nathan – Plaintiff-Appellant

38. Lubin, Robin Lynn – Plaintiff-Appellant

39. Margulies, Asher Solomon – Plaintiff-Appellant

40. Margulies, Ellyn – Plaintiff-Appellant

41. Margulies, Isaac – Plaintiff-Appellant

42. Margulies, Jacob – Plaintiff-Appellant

43. Margulies, Simon – Plaintiff-Appellant

44. Marx, Eve Lapides Lubin – Plaintiff-Appellant

45. Merkin, Eytan Louis – Plaintiff-Appellant

46. Merkin, Jonathan Dov – Plaintiff-Appellant

47. Merkin, Nicholas Albert – Plaintiff-Appellant

48. Muslim Legal Fund of America – Counsel for AMP Appellees

49. National Students for Justice in Palestine – Defendant-Appellee

50. Odeh, Magdi – Defendant-Appellee

51. People's Law Office – Counsel for USPCN Appellees

52. Pina, David – Counsel for Appellee CodePink

53. Poirot, Collin – Counsel for USPCN Appellees

54. Purow, Tammie – Counsel for Appellants

55. Rom, Alona Miriam – Plaintiff-Appellant

56. Rom, Limor – Plaintiff-Appellant

57. Rom, Noam – Plaintiff-Appellant

58. Rom, Tomer – Plaintiff-Appellant

59. Saadon, Dvora Batya – Plaintiff-Appellant

60. Saadon, Elad Moshe – Plaintiff-Appellant

61. Saadon, Tamir Aharon – Plaintiff-Appellant

62. Sadun, Geula – Plaintiff-Appellant

63. Sarsour, Salah – Defendant-Appellee

64. Scriven, Hon. Mary S. – U.S. District Judge

65. Shnaider, Maurice – Plaintiff-Appellant

66. Slater Legal PLLC – Counsel for Appellees Zarefah Baroud, Taher Herzallah, and Rafeeq Jaber

67. Slater, James Murray – Counsel for Appellees Zarefah Baroud, Taher Herzallah, and Rafeeq Jaber

68. Stein, Sharon Celine – Plaintiff-Appellant

69. Students for Justice in Palestine Chapters – Defendants-Appellees

70. Syed, Shakeel – Defendant-Appellee

71. The Berkman Law Office, LLC – Counsel for Appellants

72. Tolchin, Robert J. – Counsel for Appellants

73. Traub, Hellene Kalish – Plaintiff-Appellant

74. United States Palestinian Community Network – Defendant-Appellee

75. Webb Daniel Friedlander LLP – Counsel for Appellants

76. Weinsoff, Lisa Marta – Plaintiff-Appellant

77. Within Our Lifetime – Defendant-Appellee

78. Zenilman, Eli Dov Weinsoff – Plaintiff-Appellant

79. Zenilman, Eitan Pinchas – Plaintiff-Appellant

80. Zenilman, Robert Alan – Plaintiff-Appellant

81. Zenilman, Yonah Chava Landau – Plaintiff-Appellant

82. Zenilman, Yonatan Meir Weinsoff – Plaintiff-Appellant

## TABLE OF CONTENTS

Certificate of Interested Persons .......... i

Table of Authorities .......... viii

Interest of *Amicus Curiae* .......... 1

Background .......... 2

Argument .......... 6

I. Congress enacted the Anti-Terrorism Act to create a broad private-enforcement mechanism to punish and deter terror finance .......... 7

II. The district court's narrow construction of the Anti-Terrorism Act undermines Congress's objectives .......... 13

Conclusion .......... 19

Certificate of Compliance .......... 20

## TABLE OF AUTHORITIES

### Cases

*Boim v. Holy Land Found. for Relief and Devel.*,
549 F.3d 685 (7th Cir. 2008) .......... 15
*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .......... 14
*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .......... passim
*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981) .......... 1
*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 1, 6
*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) .......... 6
*Nye & Nissan v. United States*,
336 U.S. 613 (1949) .......... 18
*Stansell v. Revolutionary Armed Forces of Columbia*,
2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022) .......... 8
*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... passim

### Statutes

18 U.S.C. § 2333 .......... passim
18 U.S.C. § 2333(a) .......... 7
18 U.S.C. § 2333(d)(2) .......... passim
Pub. L. 114-222, 130 Stat. 852 (2016) .......... 1, 10
Pub. L. No. 101-519, 104 Stat. 2250 (1990) .......... 1

### Rules

Eleventh Circuit Rules 26.1-1 - 26.1-3 .......... i
Federal Rule of Appellate Procedure 26.1 .......... i
Federal Rule of Appellate Procedure 29(b)(4) .......... 20
Federal Rule of Appellate Procedure 32(a)(5) .......... 20
Federal Rule of Appellate Procedure 32(a)(6) .......... 20
Federal Rule of Appellate Procedure 32(f) .......... 20

**Other Authorities**

*Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 101st Cong., 2d Sess. 136 (1990) .......... 9
137 Cong. Rec. 8143 (1991) .......... 9
138 Cong. Rec. 33629 (1992) .......... 6
Restatement (Third) of Torts: Intentional Torts to Persons § 10 .......... 16
S. Rep. No. 102-342 .......... 9

## INTEREST OF *AMICUS CURIAE*

Like all states, Florida has a textbook compelling interest in thwarting terrorism. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) ("[C]ombating terrorism is an urgent objective of the highest order."); *see also Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299–300 (1981) (explaining that protection of public health and safety "is a paramount governmental interest"). Congress created the Anti-Terrorism Act in 1990 to provide victims of terrorism with a meaningful civil remedy, while reinforcing a broader effort to deter and disrupt terrorist support networks. *See* Antiterrorism Act of 1990, Pub. L. No. 101-519, 104 Stat. 2250 (1990). Subsequent laws like the Justice Against Sponsors of Terrorism Act only strengthened that private-enforcement regime. Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016). When a Florida resident sues to recover damages under these laws, the State of course has an interest in the outcome.

Indeed, allowing plausible Anti-Terrorism Act claims to proceed serves the interests of justice for victims of terrorism *and* advances the

State's own interest in preventing and deterring terrorist organizations from operating within the United States.

## BACKGROUND

On October 7, 2023, Hamas inflicted a form of antisemitic terror not seen since the Holocaust, viciously murdering, raping, torturing, and mutilating thousands of innocent civilians in Israel. *See* DE6 ¶ 79. But Defendants' support for Hamas began long before October 7. Plaintiffs allege that Defendants are part of a decades-long support network that Hamas created to raise capital, spread propaganda, recruit, and advance the terrorist organization's objectives within the United States. *E.g.*, DE6 ¶¶ 98, 131–146.

According to the First Amended Complaint, Hamas and the Muslim Brotherhood established that network through organizations including the Islamic Association for Palestine ("IAP"), the American Muslim Society ("AMS"), and the Holy Land Foundation ("HLF"). Plaintiffs' complaint outlines that, at a 1993 meeting in Philadelphia, Hamas-affiliated leaders planned an expansion of their influence in the United States by infiltrating the media, academia, and research centers while concealing their affiliation with Hamas. DE6 ¶¶ 99, 105, 132–145, 404–405.

Years later, when HLF and its leaders were convicted of providing material support to Hamas and other terrorist organizations—as Plaintiffs outline—Defendants changed tact and reorganized instead of ceasing their terroristic support. American Muslims for Palestine (AMP) allegedly emerged as the successor organization with many of the same leaders, pursuing the same mission. The same leaders allegedly created Americans for Justice in Palestine Educational Foundation to fundraise and AMP and United States Palestinian Community (USPCN) to assist in building Hamas's student base in the United States. The Complaint alleges that these organizations continued the work of Hamas's earlier American organizations, operating under the guise of new names. DE6 ¶¶ 99, 112–130.

Plaintiffs continued and alleged that Defendants provided multiple forms of material support to Hamas. AMP raised significant dollars through organizations that funneled financial assistance to Hamas; AMP leaders continued fundraising via Hamas intermediaries; and those fundraising activities helped finance Hamas's propaganda and operations within the United States. DE6 ¶¶ 135–143, 154, 160–161, 183–185.

On top of financial support, Plaintiffs alleged that Defendants built and operated Hamas's American propaganda and recruitment apparatus. AMP and USPCN created National Students for Justice in Palestine as Hamas's student organization. In turn, SJP trained student activists, promoted Hamas's ideology, glorified acts of terrorism as "resistance," celebrated convicted terrorists, coordinated with organizations including Within Our Lifetime and CodePink, and used campuses throughout the United States to spread Hamas's message and recruit future supporters. DE6 ¶¶ 150–210, 224–269, 297.

Plaintiffs further alleged that when Hamas launched its October 7 attacks, Defendants immediately responded by activating their nationwide network. Plaintiffs alleged that SJP distributed its "Day of Resistance Toolkit" endorsing Hamas's "Operation Al-Aqsa Flood," encouraging supporters to "normalize" the attacks and even "support" them. SJP also portrayed armed violence as a legitimate means of achieving Hamas's terroristic goals. Plaintiffs alleged that Defendants organized nationwide campaigns, promoted Hamas propaganda on social media, coordinated a "National Day of Resistance," and mobilized supporters in response to Hamas's direction. DE6 ¶¶ 272–313, 338–386.

Defendants' conduct after October 7 also revealed the true nature of their relationship with Hamas. Plaintiffs alleged that SJP publicly declared that it was "PART of this movement, not in solidarity with this movement," while Hamas leaders praised the American organizations as "our resistance abroad," thanked them for their efforts, and urged them to continue supporting Hamas's goals. DE6 ⁋⁋ 293, 301, 337–40.

Government officials and universities responded to this concerted support of terrorism. For example, Governor Ron DeSantis directed that SJP chapters be removed from Florida's public universities, concluding that state recognition of those organizations amounted to "funding jihad," and Florida's university system determined that SJP had violated state law through its support of terrorism. Other universities similarly suspended or banned SJP chapters following October 7. DE6 ¶¶ 320–326.

Plaintiffs seek to hold Defendants civilly liable under the Anti-Terrorism Act for knowingly providing material support to Hamas, and Plaintiffs have successfully pled their claims. The district court erroneously construed the facts and inferences in a light *un*favorable to Plaintiffs and simultaneously hampered constitutional efforts to thwart terrorism. Florida urges this Court to reverse the district court's ruling.

## ARGUMENT

Governments have a compelling interest in stopping terrorism. *Humanitarian L. Project*, 561 U.S. at 28. They attempt to do so in many ways. Criminal prosecution, civil liability, international sanctions, anti-money laundering efforts, and other laws, all working together, contribute to the cause.

The Anti-Terrorism Act is one such mechanism. Congress enacted that law, codified at 18 U.S.C. § 2333, to "deter and punish the support of terrorism" by authorizing "private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). By enabling private individuals to sue terrorists and their supporters for treble damages, the Anti-Terrorism Act strikes at "the resource that keeps [international terrorists] in business—their money." 138 Cong. Rec. 33629 (1992) (statement of Sen. Chuck Grassley). The district court erred in dismissing Plaintiffs' amended complaint. Its overly narrow reading of the Anti-Terrorism Act frustrates Congress's legitimate objects in passing the Act and makes Floridians less safe.

## I. Congress enacted the Anti-Terrorism Act to create a broad private-enforcement mechanism to punish and deter terror finance.

Congress intended private enforcement to be a key component in the fight against terror. Consider, for example, aiding-and-abetting liability under the Anti-Terrorism Act. Section 2333(d)(2)'s text, context, and history demonstrate that a terror supporter need not know of or intend any specific act of terror to be liable for aiding and abetting; it suffices that the person knows the violent character of the organization it supports and generally encourages the organization's mission. In other words, culpable association. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498 (2023).

The Anti-Terrorism Act authorizes a U.S. national injured by "an act of international terrorism" to sue to "recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). As initially enacted in 1990, the Act was ambiguous about whether it permitted suits only against perpetrators of terrorism directly, rather than permitting secondary liability for third parties who aided or conspired with terrorists. *Taamneh*, 598 U.S. at 483. But in 2016, Congress expressly expanded Section 2333's coverage. *Id.* (citing

Justice Against Sponsors of Terrorism Act (JASTA)). As amended by JASTA, Section 2333 now provides that "liability may be asserted as to any person who aids or abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

Liability under the Act is intentionally broad. In introducing civil liability and treble damages, the Anti-Terrorism Act "reflects both a desire to punish terrorists via criminal and civil penalties and to compensate victims of terrorism." *Stansell v. Revolutionary Armed Forces of Columbia*, 2022 WL 17830551, at *5 (S.D.N.Y. Dec. 21, 2022).

Section 2333's text, context, and history reflect the Anti-Terrorism Act's broad imposition of liability for supporting terrorism. To begin with, Section 2333 employs the standard language of tort law. It authorizes secondary liability for "any person" who either "aids and abets" a foreign terrorist organization in committing an act of international terrorism or who "conspires with" such a group. 18 U.S.C. § 2333(d)(2). Even before Congress created Section 2333(d)(2), the Anti-Terrorism Act was expansive. The sponsor of the Act, Senator Grassley, explained that the Act "accords victims of terrorism the remedies of American tort law."

137 Cong. Rec. 8143 (1991). The Act was understood to impose "liability at any point along the causal chain of terrorism," with the objective of "interrupt[ing], or at least imperil[ing], the flow of money" to terrorists. S. Rep. No. 102-342, at 22 (1992). Along that causal chain, the Act reaches not only terrorists directly but those who support them.

Thus, even as initially conceived, Section 2333 "br[ought] all . . . tort law potential into any of these civil suits." *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 101st Cong., 2d Sess. 136 (1990). That tortious liability included secondary, or vicarious, liability. *Id.* at 136–37. Congress knew that most international terrorists do not bank in the United States. But "organizations [and] businesses . . . who support, encourage[,] and supply terrorists," *id.* at 126, sometimes do, and their assets were always reachable under the Act.

Then, with its explicit references to aiding and abetting, conspiracy, and material assistance, *see* 18 U.S.C. § 2333(d)(2), Congress doubled down on the sweeping reach of the Anti-Terrorism Act in JASTA. Indeed, JASTA explicitly codified common-law tort principles. There, Congress identified *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) as a

"leading case" governing federal aiding-and-abetting liability, and instructed that *Halberstam* "provides the proper legal framework for how such liability should function" for purposes of Section 2333(d)(2). 130 Stat. 852. Given that guidance, the Supreme Court has cited *Halberstam* as the "conceptual core" of aiding-and-abetting liability under Section 2333. *Taamneh*, 598 U.S. at 493.

A discussion of that case is therefore illustrative. In *Halberstam*, the D.C. Circuit considered whether Linda Hamilton was liable for aiding and abetting an unplanned murder that her live-in boyfriend, Michael Welch, committed during a burglary. Hamilton was unaware that Welch would commit the murder and was not present during the break-in when it happened. *Halberstam*, 705 F.2d at 474–76. But Welch had committed "innumerable burglaries" over several years, and Hamilton had served as his "banker, bookkeeper, recordkeeper, and secretary" for those crimes, helping to launder the "fortune" she and Welch acquired by selling the stolen goods. 705 F.2d at 474, 476, 486–87. For example, buyers "made their checks payable to [Hamilton]," and she deposited them into her own accounts. *Id.* at 475. Hamilton also knew that Welch had

"installed a smelting furnace in the garage and used it to melt gold and silver into bars." *Id.*

From those facts, the D.C. Circuit reasoned that although Hamilton did not intend the murder, she "knew full well the purpose of Welch's evening forays" and "was a willing partner in his criminal activities." *Id.* at 486 (brackets and citation omitted). She thus was liable as an aider and abettor to the murder. *Id.* at 488–89.

Congress, by using a "familiar" common-law phrase like "aids and abets"—and by expressly incorporating *Halberstam*—imported the "old soil" of tort liability into Section 2333(d)(2). *Taamneh*, 598 U.S. at 484. Aiding and abetting under the Anti-Terrorism Act thus turns on "three main elements." *Id.* at 486. Drawn from *Halberstam*, those elements include: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (3) "the defendant must knowingly and substantially assist the principal violation." *Id.* at 486 (quoting 705 F.2d at 477). But *Halberstam*'s elements can be "merged or articulated somewhat differently without affecting their basic thrust." *Id.* at 487 (quoting

705 F.2d at 478 n.8). So rather than accept "its formulations" as "immutable components," courts should understand *Halberstam*'s "framework" as one to be "adapted as new cases test their usefulness in evaluating vicarious liability." *Id.* (quoting 705 F.2d at 489).

Reviewing all this law, *Taamneh* distilled the "basic thrust" of aiding-and-abetting liability under Section 2333(d)(2). *Id.* at 488. Under the Anti-Terrorism Act, a person "may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Id.* This "concept of 'helping'" a tortfeasor is not "boundless," as "[s]ome level of blameworthiness is . . . ordinarily required." *Id.* at 488–89. And "[t]o keep aiding-and-abetting liability grounded in culpable misconduct," Section 2333(d)(2) "requires that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Id.* at 490 (internal quotation marks omitted).

Aiding and abetting can include "words of encouragement" as easily as it can "driving the getaway car." *Id.* A "close nexus between the assistance and the tort" is not required. *Id.* While a close nexus "might

help establish" aiding-and-abetting liability, "even more remote support can still constitute aiding and abetting in the right case." *Id.*

*Taamneh* and *Halberstam* clarify what that "right case" looks like. When a third party's "assistance" to a violent organization is "so intentional and systematic," the third party will be deemed to have "assisted each and every" criminal act committed by the organization. *Id.* at 495; *see also id.* at 496 ("Moreover, in appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary is defendant is aiding and abetting *every* wrongful act committed by that enterprise[.]").

Properly understood, the Anti-Terrorism Act is an important protection for the victims of terrorism. And because the Act takes money out of the pockets of terror financiers and supporters, it is a crucial impediment to future acts of terrorism.

## II. The district court's narrow construction of the Anti-Terrorism Act undermines Congress's objectives.

With those principles in mind, the district court both unduly narrowed Section 2333(d)(2)'s scope and erred in finding the allegations in the amended complaint insufficient.

**A.** The district court's narrow construction of the Anti-Terrorism Act at every step ignores Congress's "comprehensive legal response to international terrorism." *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 6 (2025). Take, for example, Plaintiffs' aiding-and-abetting claim, which should have survived the motion to dismiss.

It is undisputed that Hamas committed the October 7 terrorist attacks. But the district court required explicit foreknowledge of the October 7 attacks before Defendants could be said to have aided or abetted Hamas on that day. DE112 at 7–8 (dismissing Count II in part because "Plaintiffs do not allege any general awareness of the October 7 attacks by any Defendant"). That misses the mark on the second element of an Anti-Terrorism Act aiding-and-abetting claim.

As *Taamneh* makes clear, "aiding and abetting does not require the defendant to have known all particulars of the primary actor's plan." *Taamneh*, 598 U.S. at 495 (internal quotation omitted). For this claim, Plaintiffs must only show that the Defendants "consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Id.* at 497 (citation modified). For that, in turn, it is enough that Defendants' involvement and support for Hamas were "so systemic" that

Defendants were effectively "aiding and abetting every wrongful act committed by that enterprise." *Id.* at 496. When that level of involvement is met, a third party is liable even when it "did not lend any specific support" to the unlawful act. *Id.* at 495. Contrary to the district court's insistence on Defendants' "general awareness" of a "*specific act*"—the "October 7 attacks," DE112 at 7 (emphasis added)—Section 2333(d)(2) merely requires "general awareness of [the third party's] role in a continuing criminal enterprise." *Halberstam*, 705 F.2d at 488. And these Defendants knew of Hamas's mission (Intifada) and actions (terrorism). *Infra*, Section II.B; *see also Boim v. Holy Land Found. for Relief and Devel.*, 549 F.3d 685, 700 (7th Cir. 2008) (explaining that terrorist organizations engage "in violence as a declared goal of the organization").

The district court also missed the mark on element three of aiding and abetting. The district court required that Plaintiffs show that Defendants "knowingly provided substantial assistance to Hamas in the commission of the *specific* actionable wrong." DE112 at 8 (emphasis added). Again, *Taamneh* refutes that theory.

In *Taamneh*, the Supreme Court explained that the "twin requirements" of "knowing and substantial assistance to the primary tortfeasor"

are connected. 598 U.S. at 491. The two "work[] in tandem, with a lesser showing of one demanding a greater showing of the other." *Id.* at 491–92. Though "it is not enough" that the defendant "have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it," a defendant need not "have known 'all the particulars of the primary actor's plan.'" *Id.* at 495 (quoting Restatement (Third) of Torts: Intentional Torts to Persons § 10, Comment *c*, p. 104 (Tent. Draft No. 3, Apr. 6, 2018)).

"As *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id.* at 496 (quoting 705 F.2d at 488). This is true even if they "did not lend any specific support" to the unlawful act. *Id.* at 495. It is no secret that Hamas is a terrorist organization, but Defendants support Hamas all the same. They therefore aid in the commission of terrorism. *Cf. id.* at 486, 488–89 (explaining that Hamilton "knew full well the purpose of [her boyfriend's] evening forays," such that assisting in the forays amounted to aiding and abetting). The death and destruction of October 7 were "foreseeable consequence[s] of" supporting terrorism. *Id.* at 495.

**B.** At the pleading stage, Plaintiffs have alleged more than enough. Plaintiffs' amended complaint abounds with examples of Defendants' support and encouragement of Hamas and terrorism at large. *E.g.*, DE6 ⁋⁋ 6–10, 114–29, 144–69. In 2017, for example, one Defendant went so far as to claim that "[i]t's about time that we have an Intifada [violent uprising] in this country. We have been watching Intifada in Palestine, we've been watching an uprising in Iraq and the question is that: what are we doing? How come we don't have Intifada in this country?" *Id.* at ⁋ 155.

Plaintiffs alleged that Defendant AMP has extensive ties to Hamas and terrorism, dating back to its founding. *E.g.*, DE6 ⁋ 98, 102, 103. AMP's leadership core is allegedly the same as former terrorist organizations. *Id.* at ⁋ 116, 118. Plaintiffs alleged that on May 22, 2021, Defendant Taher Herzallah expressly encouraged Hamas, stating publicly that "Hamas plays an integral role in policy and society." *Id.* at ⁋ 123. A day before, AMP co-sponsored a Minneapolis protest during which protestors chanted "we are the men of Muhammad Deif [head of the military wing of Hamas]," calling for "Intifada." *Id.* at ⁋ 125.

Plaintiffs also alleged that Defendant AMP financially supported Hamas and terrorism, raising $200,000 at an event in 2014 and publicly calling for donations to a Hamas-conduit entity in 2016. *Id.* at ⁋ 140. Defendant SJP, an alleged outgrowth of AMP, *id.* at ⁋ 147, also fund-raised for Hamas conduits and called for Intifada. *Id.* at ⁋⁋ 154, 155, 156. SJP's alleged goal is to infiltrate academia to persuade youth to oppose "peace with Jews." *Id.* at 145.

At this stage, Plaintiffs have surely met their pleading burden. Plaintiffs have shown that Defendants not only culpably associated with Hamas and terrorism, Defendants wished to bring about Hamas's mission (Intifada) and helped make it succeed through consistent support. *Taamneh*, 598 U.S. at 498 (citing *Nye & Nissan v. United States*, 336 U.S. 613, 619 (1949)). As alleged, Defendants' support of Hamas is intentional and systemic.

* * *

The district court's rigid analysis of Plaintiffs' aiding-and-abetting claim—alongside similarly flawed analyses of Plaintiffs' conspiracy and material support claims—simultaneously misreads the Anti-Terrorism

Act and minimizes its utility. This Court should reverse the dismissal order.

## CONCLUSION

This Court should reverse.

Dated: August 10, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

*/s/ Tyler E. Gustafson*
JEFFREY PAUL DESOUSA
*Chief Deputy Solicitor General*
TYLER E. GUSTAFSON
*Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*tyler.gustafson@myfloridalegal.com*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(b)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,416 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Tyler E. Gustafson*
*Assistant Solicitor General*

## CERTIFICATE OF SERVICE

I certify that on August 10, 2026, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Tyler E. Gustafson*
*Assistant Solicitor General*